IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ROBERT HADDAD,                    )
                                  )
        Plaintiff,                )
                                  )
        v.                        )        No.  2:20-cv-00396-PPS-JEM
                                  )
MIDWEST PIPECOATING, INC.,        )
                                  )
        Defendant.                )

### ANSWER, COUNTERCLAIM AND AFFIRMATIVE DEFENSES

_____

Defendant MIDWEST PIPECOATING, INC., d/b/a Midwest Pipe Coating, Inc. ("MPC"),

by its undersigned counsel, responds to the Complaint filed by Plaintiff ROBERT  HADDAD

("Haddad") as follows:

JURISDICTION AND VENUE

1.    This is an action for injunctive and declaratory relief brought on behalf of Mr.
Haddad, an employee of MWPC.  The plaintiff has suffered discrimination on the basis of his country
of origin in violation of the Civil Rights Act of 1964 as amended ("Title VII").  If Defendant is not
enjoined, Plaintiff will continue to be subjected to such discrimination.

ANSWER:  MPC admits that Haddad's action is styled as an action for injunctive and declaratory

relief pursuant to Title VII.  MPCs denies that Title VII was violated, or Haddad is entitled to any

such relief.

2.    This court has subject-matter jurisdiction of this complaint pursuant to 28 U.S.C.A.
§§ 1331, and 1343(a)(4).

ANSWER:  Admitted.

3.    Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201, 2202
and Rule 57 of the Federal Rules of Civil Procedure.

1

ANSWER:  MPC admits Haddad alleges such claims, but declines that he is entitled to any such relief.

4.     Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. §§ 2283, 2284 and Rule 65 of the Federal Rules of Civil Procedure.

ANSWER:  MPC admits Haddad alleges such claims, but declines that he is entitled to any such relief.

5.     This cause of action arose in the Northern District of Indiana. Therefore, venue is proper under 28 U.S.C. Section 1391(b).

ANSWER: MPC admits that venue is proper in this District because Haddad was employed by MPC in this District.

6.     Venue is proper in this district pursuant to 28 U.S.C.A. § 1391 also because MWPC resides in Indiana, is an entity with the capacity to sue and be sued in its common name under applicable law and is subject to this court's personal jurisdiction.

ANSWER:  MPC admits that it is present in this District and that therefore venue is proper in this District.

FACTS COMMON TO ALL COUNTS

7.     Plaintiff exhausted his administrative remedy [*sic*] with the United States Equal Employment Opportunity Commission prior to filing this suit. (**Ex. 1**).

ANSWER:  MPC admits that Haddad filed a timely Charge with the EEOC in the form attached to the Complaint, and that in response to that Charge, upon investigation, on August 12, 2020 the EEOC issued a determination that it "is unable to conclude that the information obtained establishes violations of the statutes."

8.     On August 5, 1988 Mr. Haddad was born. He is of Jordanian and Syrian descent ("Middle Eastern").

ANSWER:  MPC is informed (by Haddad and his identification documents) and believes that

2

Haddad was born August 5, 1988.  MPC is further informed that Haddad identified himself as "White" in the EEO survey he filled out when hired by MPC, and that subsequently (when alleging discrimination) he identified himself as "Arabic."  To the best of MPC's knowledge, Haddad is a native-born American of "white" appearance, indistinguishable from other employees of the same appearance, and a Christian.  MPC lacks knowledge or information sufficient to form a belief about whether Haddad is of Jordanian and Syrian descent.

9.   Plaintiff began working for the defendant in February of 2019 after applying via Indeed to MWPC's advertisement. Plaintiff worked out of Defendant's Schererville office as an IT specialist.

ANSWER:  MPC admits that Haddad became employed by MPC on February 4, 2019 at its Schererville, Indiana facility with the title of IT Generalist.  MPC admits that Haddad applied for employment via www.indeed.com pursuant to an ad which MPC posted there.  Except as answered above, MPC denies the allegations of this paragraph.

10.   As a condition of employment, MWPC required by HR Officer Jeff Clapman Plaintiff to complete an EEO survey declaring his demographics.

ANSWER:  MPC admits that immediately after he was hired, *via* Jeff Clapman, MPC asked Haddad to complete a "Post-Hire Questionnaire" which including a section entitled "EEO Information" which covered his birth date, race, sex, and disability and veteran status.  Haddad completed this form voluntarily and without any protest and was in no way coerced to do so.  MPC did not instruct Haddad in any way how to answer the questions or how to identify himself, and Haddad freely and voluntarily identified himself as "Caucasian/White."  Except as answered above, MPC denies the allegations of this paragraph.

11.   On February 14, 2019, Defendant required Plaintiff to file weekly task reports; He was the only person required to do such reporting.

ANSWER:  MPC admits that within a week or two after Haddad began work, Haddad's supervisor

3

Aaron Juarez asked Haddad to provide a weekly list of tasks he had accomplished, and to meet with

him weekly to discuss this report and his weekly work.  Haddad was, at that time, a new employee

and there was doubt and concern as to what, and how much, he was accomplishing during his work

day.  Except as answered above, MPC denies the allegations of this paragraph.

12.   On April 3, 2019, Plaintiff complains [*sic*] to Defendant's HR office and to one of
his bosses about racial slurs being made against Plaintiff by a manager named Aaron Juarez.
Specifically, Plaintiff advised that the manager was making Arab (AY-RAB)comments [*sic*].

ANSWER:  MPC admits that on or about March 21, 2019 after one of their weekly update meetings,

Juarez and Haddad had a personal conversation in which, for the first and only time, Haddad's

ethnicity was referred to by someone besides Haddad.  Noting that Juarez is Mexican-American,

Haddad told Juarez that he used to be "the boss of several Mexican line cooks" at his cousin's

restaurant, that they used to "come crying" to him that his cousin was not paying them, and that he

would intercede for them and get them paid.  Allegedly (as he later said) "to demonstrate what respect

or cultural awareness really is," Haddad recited all their names in what he considered a correct

"Mexican accent," told Juarez which Mexican states they were from, and said his cousin had "even"

once employed an Ecuadorean.  In this conversation, Haddad asked what Juarez did that previous

weekend and Juarez said he went to a friend's house, and mentioned in passing that his friend was

of Arab origin.  Juarez added that his friend's wife makes amazing food, and that he loves Arab food

and music.  Juarez said they often have get-togethers with friends.  Juarez never complained about

Haddad's patronizing and borderline racist remarks.  At the time, Haddad did not complain about

Juarez' remarks, and did not take issue with his pronunciation of the word "Arab."  This was a casual,

friendly conversation.  Months later, after he was caught sleeping on the job, Haddad complained to

HR about Juarez.  For the first time, Haddad claimed that in their March 21, 2019 conversation,

Juarez had pronounced the word "Arab" as "Ay-rab," and for the first time, claimed that this was a

4

"racial slur."  Except as answered above, MPC denies the allegations of this paragraph.

13.   After Plaintiff complained, Defendant's manager phoned the plaintiff and informed the plaintiff specifically "I Don't know how you are going to make it here . . . your life is coming to an end here."

ANSWER:  Denied.

14.   August 29, 2019 Plaintiff requests [*sic*] a screen blocker for his computer to ease the strain on his eyes, but his request was ignored.

ANSWER:  MPC admits that Haddad requested a screen blocker, and that the request was denied.

Throughout his tenure as an employee of MPC, Haddad showed a near-obsessive concern with the

possibility of other employees looking over his shoulder and/or seeing what he was doing on his

screen.  Haddad's supervisor Aaron Juarez and HR Manager Jeff Clapman, who already questioned

how Haddad could spend an entire work day at his computer and yet accomplish so little in actual

work, were concerned that he might be trying to conceal illegal or inappropriate activity, and had no

interest in facilitating this concealment by giving him a screen blocker.  Except as answered above,

MPC denies the allegations of this paragraph.

15.   On or about September 12, 2019 Mr. Haddad makes [*sic*] an expense request of manager Juarez.  Defendant's manager purposely did not reply.

ANSWER:  MPC admits that when it became clear Haddad was in danger of being fired, he

submitted a large expense request, which was denied as inappropriate.  Except as answered above,

MPC denies the allegations of this paragraph.

16.   On or about September 12, 2019, Plaintiff complains [*sic*] a second time to HR about Juarez and his racial slurs and about his taking a photo of Plaintiff.

ANSWER:  During the week of September 9, 2019, multiple employees reported to Juarez that

Haddad was sleeping at his work station.   After the last complaint, Juarez went to check, and found

Haddad fast asleep and snoring.  Juarez did not wake Haddad, but knowing by now that Haddad

habitually denies any wrongdoing, Juarez used his phone to take a still photo of him sleeping, and then went back to his office.  When he awoke, Haddad checked the recorded security video feed which he was accessing and displaying on his desktop in direct contravention of company policy, and saw Juarez taking his photo while he was asleep.  Haddad immediately ran to Juarez' office in a panic, sputtering that he was going to sue the company and file discrimination charges.  At no time did Haddad offer any explanation for sleeping at his desk.  Instead, he vehemently denied the obvious fact that he was sleeping.  He claimed that the still photo was misleading, and that the video feed showed him "clearly twiddling his thumbs" at the time.  Haddad then ran to the HR manager (Clapman) to complain about being photographed, and later sent the HR manager an email and text messages suggesting that Juarez took the photo "to satisfy a sexual desire of his," proclaiming his lack of homophobia while also proclaiming "this is gay," and demanded that Clapman order Juarez to delete all photos of him.  Haddad did not mention the so-called "racial slur," which consisted only of pronouncing the word "Arab" in a way which he did not approve of, at this time.  Except as answered above, MPC denies the allegations of this paragraph.

17.   Taking   photos   while on MWPC's premises is specifically prohibited of all employees.

ANSWER:  MPC admits that it has a policy against taking photographs in its facility, but that policy is aimed at protecting MPC's trade secrets and not at protecting employees from someone documenting their misconduct, and it is enforced at the discretion of management.  Except as answered above, MPC denies the allegations of this paragraph.

18.   On September 12, 2019, Defendant's manager submits [*sic*] the photo to managers and erroneously describes the picture of being Plaintiff sleeping at his desk – when he was supposed to be working. This was untrue, Plaintiff, being a salaried employee, arrived forty minutes early that day and was on break at 4:55 PM as the clock was turning to 4:56 PM and others were leaving for the day.

6

ANSWER:  MPC admits that after Haddad complained to HR (Clapman) about being photographed, Juarez showed Clapman the photo, which plainly shows Haddad sleeping at his desk.  At no time until the filing of this Complaint did Haddad claim to have been "on break" at the time;  He simply denied he was sleeping and claimed that pictures lie.  The complaints that he was sleeping on the job had started several days earlier, and he had been reported asleep at this desk that morning; This was not an isolated incident that happened at 4:55 on one day.  Regardless of the time of day, Haddad was not supposed to be sleeping at his desk.  Instead of apologizing or offering any explanation for his behavior, Haddad accused Juarez of taking the photo for sexual gratification and complained that it was "gay."  Except as answered above, MPC denies the allegations of this paragraph.

19.   When asked to explain, Plaintiff provided evidence to defendant of his being active up to the point when he went on break.

ANSWER:  MPC admits that when confronted about sleeping on the job, Haddad provided a video recording from the company security system, which he was not supposed to have accessed or copied, and which he claimed showed that he was "clearly twiddling his thumbs" when the still photo was taken.  The video does not show any obviously conscious movement, and is not from the same angle as the still photo and therefore does not show the Haddad's face or most of his body.  The video does not disprove that Haddad was sleeping.  Haddad did not claim to have been on break, and never suggested that the video showed any such thing.  Except as answered above, MPC denies the allegations of this paragraph.

20.   Defendant advised Plaintiff that he was not to come into work on September 13, 2019, pending an investigation. Manager Juarez remained at work.

ANSWER:  MPC admits that on September 13, 2019 Haddad simply did not show up for work.  He was not told to stay home, and he was supposed to be working.  Juarez, of course, was at work.  That morning, there was a sudden unexplained partial email outage at the MPC's facility.  MPC's

employee Nancy Morgan emailed Haddad from her personal email account (her work email was not working) to ask him to do something about the email outage, which was his job. Haddad refused, responding "don't call me on my off days," and then sent another email to several people saying "Aaron [Juarez] is a smart guy, ask Aaron to fix it." Haddad later explained his absence from the office by claiming he had "assumed" he was terminated after the sleeping incidents, although no one had told him that. Clapman contacted Haddad and told to come to work, as he was still on the payroll, and to restore email service. It was strongly suspected that Haddad had caused the email outage himself maliciously and in retaliation for being caught sleeping on the job, but he was just asked to make it stop. After he restored email service, Clapman instructed Haddad to leave, but said he would remain on the payroll pending further review of the situation, and would be expected to work. Haddad continued to come to work. Except as answered above, MPC denies the allegations of this paragraph.

21. For a third time, on September 16, 2019, Plaintiff complains [*sic*] to Defendant's HR about manager Juarez's racial slurs, character assassination, and defamation.

ANSWER: MPC admits that after he was caught sleeping by Juarez, Haddad initiated a vendetta against Juarez and accused him of numerous things, including being "gay," taking the photo for sexual gratification, being "racist," being "a moron," being "pure evil," and of "defaming" Haddad by truthfully reporting his conduct. MPC has no record of the complaints described in this paragraph on the specific date of September 16, however. Except as answered above, MPC denies the allegations of this paragraph.

22. Again, on September 17, 2019 Mr. Haddad asks Juarez for expense reimbursements like other non-Middle Eastern American employees were being reimbursed. Manager Juarez sends the [sic] on to upper management and says he would not grant the expense. The request was ignored.

ANSWER: MPC denies that Haddad was ever characterized by anyone, including himself, while

working for MPC, as a "Middle-Eastern American."  On the contrary, Haddad identified himself in his post-hiring survey responses as "White," and made sure to let fellow employees of MPC know he was a Christian.  Later on, when his job performance was criticized, Haddad identified himself as "Arab."  At no time was any distinction made between Haddad and other employees based on actual or perceived race or ethnicity.  Expense reimbursement requests were handled on a case-by-case basis, for Haddad and all other employees.  MPC admits that when it became clear that Haddad was in trouble, Haddad submitted a large number of purported expenses in an apparent attempt to extract as much money from MPC as he could before he was fired, and that those requests were found to be inappropriate and were denied.  Except as answered above, MPC denies the allegations of this paragraph.

23.   On or about September 19, 2019, manager Juarez receives [*sic*] a written reprimand from Defendant for using racial slurs which he admitted using against Plaintiff.

ANSWER:  MPC admits that on or about September 19, 2019, as a matter of formality, Juarez was written up by HR for pronouncing the word "Arab" in a way that Haddad professed to find offensive in the single conversation which had occurred back in March without complaint from Haddad until he was caught sleeping on the job.  Juarez was cautioned to be careful about racial and ethnic sensitivities, and to avoid saying things about race or ethnicity which could be misunderstood, even in response to a remark by an employee.  Except as answered above, MPC denies the allegations of this paragraph.

24.   On September 19, 2019, Juarez emails [*sic*] Plaintiff's boss and complains about Plaintiff's work quality, his inability to write computer code, and a complaint from a non-Middle Eastern employee that worked with Plaintiff.  In fact, Plaintiff was called by that employee, likely as a ruse planned by Defendant's managers to get Plaintiff in trouble, to help her out with her PC.

ANSWER:   Juarez <u>was</u> Haddad's boss, and Haddad's chronic insubordination and refusal to

acknowledge this were part of the reason for his termination.  MPC admits that on September 19, 2019 at 2:39 a.m., Haddad emailed Juarez, copying Clapman, company General Manager Joel Chermak, and an officer of the parent company, accusing Juarez of "defamation" for telling him not to load unauthorized software (unsecure freeware called Spybot) onto MPC's network.  Later that day, for no apparent reason, Haddad approached Christy Crowley, another employee, and asked how many children she had.  On being told she had one, he said "oh, I figured you'd be on your fourth child by now," and claimed he had thought she was Clapman's daughter, because "companies like this like to hire family."  Crowley felt threatened by Haddad's demeanor and his questions about her family, and complained to HR.  Later on the same day (September 19) Bernadette Cwik, who had reported Haddad earlier for sleeping on the job, complained to Juarez that Haddad had walked past her work station inappropriately close and sworn at her in an intimidating manner. Juarez notified Clapman, and Clapman made Chermak aware of the situation.  Except as answered above, MPC denies the allegations of this paragraph.

25.   As to his work quality, Plaintiff was complimented on [*sic*] frequently as to his work quality and compared as being better to his predecessors by a majority of the staff. For example, he was told he was better than the last person Defendant had in IT.

ANSWER:  Haddad's predecessor in IT was fired for incompetence and illegal activity, so calling Haddad "better than the last person in IT" was not really a compliment.  Haddad may have been thanked or complimented by some of MPC's employees for his work from time to time, but from the time he was hired many people, including his supervisor, questioned his competence and wondered what he was doing with his work days.  Haddad's performance was not reviewed favorably, and there were many failures of performance.  Except as answered above, MPC denies the allegations of this paragraph.

26.  Plaintiff's IT experience spans several years, prior to Defendant he worked for an IT

10

consulting firm as a Network Systems Engineer doing Network, Server, Virtualization, Cloud, and general IT support. He worked for the Federal Aviation Administration, Chicago Department of Aviation, Illinois Finance Authority, Illinois State Police - Bureau of Identification, A professional architectural firm, The City Colleges of Chicago, and numerous small businesses for website management and server hosting. Each of these environments rivaled the technical challenges he handled at MWPC. He brought the defendant experience similar to being responsible for ten of Defendant's IT environment - all at the same time!

ANSWER:  MPC lacks knowledge or information insufficient to form a belief as to the truth of these allegations, but based on Haddad's performance as its employee, MPC is skeptical of his claims of vast experience and great competence.  To MPC's knowledge, Haddad's former employer prior to MPC was Innovative Information Solutions, LLC, a company owned and/or controlled by Haddad and one or more members of Haddad's family.  Except as answered above, MPC denies the allegations of this paragraph.

27.   This subterfuge carried out by defendant's managers was a violation of Defendant's "rumor spreading policy" yet these non-Middle Eastern employees were not reprimanded despite the Defendant's policy warranting discipline up to and including termination for such acts.

ANSWER:  This is not an allegation of fact requiring an answer, or even a coherent sentence.  MPC denies there was any "subterfuge" or rumor-spreading or that anyone was not disciplined for inappropriate action, and otherwise denies these conclusions and opinions, and all the allegations of this paragraph.

28.   On September 20, 2019, Plaintiff refutes [sic] the claims waged [sic] against him by manager Juarez.

ANSWER:  This too is neither an allegation of fact nor a coherent, grammatical sentence.  MPC denies that Haddad "refuted" anything.  Haddad denied any wrongdoing, frequently while admitting the actual actions he was accused of and constantly changing his excuses for them while attacking the people who complained about him.  Nearly everything Haddad said in response to complaints about his job performance and on-the-job behavior only confirmed that he was a dishonest, erratic,

11

unstable personality who would never take responsibility for his actions, let alone rectify his behavior.  Except as answered above, MPC denies the allusions of this paragraph.

29.   On September 20, 2019, Plaintiff's employment is [*sic*] terminated by Defendant allegedly for violating company policy.

ANSWER:  MPC admits that Haddad was terminated as an employee on September 20, 2019. Haddad was an at-will employee, and no reason was required to terminate him.  However, there were many reasons for his termination, including but not limited to chronic and longstanding insubordination, poor job performance, the suspicion that he had been engaged in illicit and/or nonwork activities on company time, multiple instances of sleeping on the job, the suspicion that he had sabotaged the company's email system in retaliation for being confronted about sleeping on the job, and his belligerent, unapologetic, and threatening reaction to being confronted about sleeping on the job.  Except as answered above, MPC denies the allegations of this paragraph.

30.   Manager Juarez was not terminated. Neither was the Caucasian female that colluded with this manager to make a false accusation against Mr. Haddad.

ANSWER:  MPC denies that any "false accusation" was made against Haddad, who was observed by multiple witnesses on multiple occasions over several days obviously fast asleep and snoring at his desk, and was photographed very obviously asleep.   MPC admits that  at the time Haddad was fired, no one else was fired, as no one else  had done anything meriting termination.  Except as answered above, MPC denies the allegations of this paragraph.

31.  Due to the termination of his employment with the defendant, Plaintiff has lost an $85,000 annual salary and other benefits of employment with MWPC.

ANSWER:  MPC admits that, having been terminated  as its employee, Haddad is no longer receiving salary and benefits of employment by MPC.  Except as answered above, MPC denies the allegations of this paragraph.

32.   MWPC has several hundred employees and is subject to federal laws prohibiting discrimination such as The Civil Rights Act.

ANSWER:  MPC admits that it has enough employees to be subject to Title VI

COUNT I –DISCRIMINATION

33.   Plaintiff here re-alleges all preceding pleading paragraphs.

ANSWER:  MPC repeats its responses to all preceding paragraphs.

34.   Plaintiff, against his will, was required to report his demographics to Defendant as a condition of employment.

ANSWER:  MPC admits that Haddad freely completed a survey immediately after he was hired, without any coercion.  Except as answered above, MPC denies the allegations of this paragraph.

35.   Plaintiff worked in an environment where the managers would incorrectly assume Mr. Haddad's long heavy coat was traditional Arab garb, a thobe. It is very unlikley to confuse [*sic*] a navy blazer with a long white middle eastern man dress (thobe or dish dash) which supports the Defendant's managers and agents deliberately lying about Plaintiff.

ANSWER:  MPC admits that Haddad ordinarily wore a polo shirt or a button-down shirt, sometimes a blazer, and khakis to work, and no one 'incorrectly assumed" or "confused" this garb with anything. Haddad did not wear a coat of any kind while working indoors.  Once, after being caught sleeping on the job, and after for the first time making his accusation of "racism," Haddad showed up for work wearing a robe-type garment which was not a "long heavy coat" and which appeared to be intended to advertise his sudden self-identification as "Arab."  He had never dressed like this on MPC's premises before, and never did it again.  Nobody commented on this change in garb at the time. Except as answered above, MPC denies the allegations of this paragraph.

36.   Plaintiff would be accused of random accusations by the defendant's managers such as leaving the water running in the bathroom yet when plaintiff refuted the claims managers did not believe him; Defendant's acts were tantamount to profiling of plaintiff because Defendant believes non Middle Eastern white employees and profiles Middle Eastern Employees to be always up to no good.

13

ANSWER:  MPC denies that Haddad was ever "accused of random accusations," or accused by management of "leaving the water running in the bathroom."  Haddad's supervisor from time to time confronted Haddad about certain specific failures of performance and/or inappropriate behavior. None of these accusations were  unfounded, nor was this in any way constant or discriminatory. Haddad at no time "refuted" these claims, but it is true that he never admitted to any fault or wrongdoing and almost always responded to attempts to hold him accountable by attacking his accusers.  Except as answered above, MPC denies the allegations of this paragraph, and denies that Haddad was treated differently from any other employee, except to the extent that his behavior was different.

37.   Plaintiff reported to Defendant that its non-Middle Eastern employees were committing such acts and violating MWPC's policies rules by, among other things, using racial slurs.

ANSWER:  MPC admits that Haddad had a habit of responding to criticisms of his behavior by accusing other people of misconduct, but denies that any of its policies were enforced selectively, or that any other employee was given a 'pass' for policy violations.  MPC denies that Haddad complained of "racial slurs" except for the single instance in which, months after his causal conversation with Juarez about their respective backgrounds, he claimed Juarez' pronunciation of the word "Arab" was in that conversation was "racist."  This complaint was made after Juarez caught Haddad sleeping on the job, and was transparently an attempt by Haddad to retaliate against Juarez and to ward off disciplinary action.  Except as answered above, MPC denies the allegations of this paragraph.

38.   Defendant's managers would not treat Mr. Haddad fairly when they purposely ignored and thus refused him expense reimbursements that were freely given to other non-Middle Eastern employees.

ANSWER:  Denied.

39.   In its employment practices, MWPC favors [*sic*] white non-Middle Eastern employees over Mr. Haddad. Particularly, MWPC ignored the complaints of Plaintiff while acknowledging and remedying the complaints of the non-Middle Eastern employees.

ANSWER:  Denied.

40.   Defendant fired Plaintiff.

ANSWER:  MPC admits that it fired Haddad, for legitimate, nondiscrimatory, and non-pretextual causes.

41.   Plaintiff was stripped of valuable employment benefits, e.g. vacation, health insurance, Keycard, and computer logins.

ANSWER:  MPC admits that after being terminated for cause, Haddad no longer had the benefits of being an employee of MPCs, including those listed.

42.   For no other reason than his being Middle Eastern, MWPC intentionally terminated Plaintiff from his IT position and denied him the regular benefits of employment while he was employed by Defendant (e.g. expense, comfortable working conditions, recognition of his complaints).

ANSWER:  MPC admits that Haddad was terminated for cause due to his own failures of performance and inappropriate behavior, and that upon such termination, Haddad no longer had the benefits of being an employee.  Except as answered above, MPC denies the allegations of this paragraph.

43.   Even after he was terminated the defendant continued to treat Plaintiff differently when the Defendant refused to communicate why Plaintiff was terminated despite Plaintiff asking multiple times and explaining that he wanted to know for legal reasons to inform the EEOC or his attorney. Defendant's non-Middle Eastern employees are routinely given service letters or written discharge papers advising of a reason for termination.

ANSWER:  MPC admits that Haddad did not have a standard exit interview, because he became obstreperous and belligerent when told he was being terminated, kept shouting, and would not permit a normal conversation.  Therefore he was told to leave immediately and escorted from the premises.  Subsequently, MPC refrained from communicating with Haddad because he made explicit threats of

15

harm against its employees and counsel by voice telephone, text messages and emails, and engaged in threatening, stalking behavior at MPC's facility and at or near the homes of two of MPCs' employees, as well as demanding that Clapman  not contact him, or even look at him if they passed on the street.  Nonetheless, Haddad could not reasonably have been unaware of the reasons for his termination.  Except as answered above, MPC denies the allegations of this paragraph.

44.  MWPC had full knowledge and recklessly ignored its violation of the racial discrimination laws when it terminated Plaintiff and stripped him of his employment benefits based on his being Middle Eastern; In fact, Plaintiff forewarned MWPC management of the consequence of their actions for discriminating against him, that they should not be doing so.

ANSWER:  MPC denies illegally discriminating against Haddad, any denies any reckless or intentional misconduct.  MPC also denies that Haddad "forewarned" its management of any "consequences,' except for making threats of physical harm and threats to sue.  Except as answered above, Dependent denies the allegations of this paragraph.

45.  Except for his being Middle Eastern [*sic*], there is no other reason to explain why MWPC terminated and stripped Plaintiff of his employment benefits. Any such reason would necessarily be a pretext.

ANSWER:  It is completely obvious from the facts and circumstances why Haddad was fired:  From the time he was hired he was arrogant, abrasive, and insubordinate as well as deceitful and manipulative.  He was also unproductive and unresponsive to criticism, and at times seemed unable to understand what was required of him, or simply unable to do it and unwilling to admit that he could not do it.  He was obsessively secretive, did not want to be observed working, and at least once implied very strongly that he could, or would, use his position to engage in hacking and identity theft.  He was reported sleeping on the job multiple times, and engaged in threatening and retaliatory behavior when confronted about it.  Except as answered above, MPC denies the allegations of this paragraph.

46.  MWPC discriminated against Mr. Haddad by his country of origin as a determining factor in its employment decisions against him.

16

ANSWER:  Denied.

47.   MWPC's managers, Plaintiff's bosses, while acting as managers for MWPC, recklessly disregarded Plaintiff's right not to be discriminated or retaliated against; particularly so when management intentionally refused to acknowledge his complaints of racial slurs by management and instead suspended him for violating a policy but not doing the same to others who violated the policies of Defendant.

ANSWER:  Denied.

48.   At the time of these discriminations Plaintiff had passed all necessary requirements to qualify highly for his work [*sic*]. He had a good work record. Because of these factors, if Plaintiff was from other Jordan and Syria [*sic*], he would have received the respect that other non-protected employees and managers received.

ANSWER:  Denied.

COUNT II – RETALIATION

49.   Plaintiff here re-alleges all preceding pleading paragraphs.

ANSWER:  MPC repeats its responses to all preceding paragraphs.

50.   After Plaintiff complained about the racial slurs used against him by manager Juarez, MWPC allowed the manager to persist in his acts without reprimand, an offense that warrants reprimand for any MWPC employee; Not until Plaintiff was going to be terminated did Defendant choose to do so.

ANSWER:  MPC denies that Juarez used any racial slurs.  After Juarez caught him sleeping on the job, Haddad claimed that months earlier, Juarez deliberately mispronounced the word "Arab," and that that constituted a "racial slur."  Haddad had made no such accusation previously.  MPC admits that after Haddad made this accusation, Juarez was cautioned about perceptions and given a written warning.  Except as answered above, MPC denies the allegations of this paragraph.

51.   MWPC management specifically ignored Plaintiff's requests for expense reimbursements after he complained about the racial slurs he received by management.

ANSWER:  Denied.

52.   MWPC management specifically staged [*sic*] a violation of company policy by

17

Plaintiff after Plaintiff complained of racial slurs he received by management [*sic*]. Plaintiff was fired four days after complaining so [*sic*].

ANSWER:  Denied.

53.  After Plaintiff complained about the racial discrimination, MWPC's managers ignored Plaintiff's complaints that MWPC's managers were harassing him, making work difficult for him and creating a hostile work environment to which Defendant contributed and condoned. Plaintiff was described by Defendant as raising suspicion/being suspicious which can be for no other reason than his being Middle Eastern [*sic*].

ANSWER:  MPC denies that Haddad complained about racial discrimination or harassment, or that any complaints from Haddad were ignored.  MPC denies that Haddad was ever described as "suspicious," except specifically in connection with his secretive behavior and obsession with avoiding having anyone look over his shoulder or view his screen.  Except as answered above, MPC denies the allegations of this paragraph.

54.  Plaintiff refuted the counter allegations against him that were waged as [*sic*] retaliation and provided Defendant with undeniable video and photo evidence that was ignored by Defendant and its HR department – Plaintiff did not receive a fair HR investigation as other non-Middle Eastern employees do.

ANSWER:  MPC denies that Haddad "refuted" anything, or that the "evidence" Haddad produced disproved that he was sleeping.  MPC also denies that Haddad's "evidence" was ignored.  MPC denies that the allegation that Haddad was sleeping was "retaliation," and on the contrary, states that Haddad's accusation of "racial slurs" was clearly retaliation for being caught sleeping on the job. Except as answered above, MPC denies the allegations of this paragraph.

55.  Too, [*sic*] Defendant refused to believe Plaintiff's clear explanations for his alleged napping, yet Defendant believes [*sic*] the explanations of other non-Middle Eastern employees and chose not to believe him in retaliation for his complaining about discrimination.

ANSWER:  MPC denies that Haddad ever offered an explanation for sleeping on the job;  On the contrary he denied sleeping and claimed that the photo was somehow false or misleading.  MPC did not believe Haddad, because there were multiple witnesses to his sleeping on the job on multiple

occasions, and the photo was obvious confirmation that he had done so.  MPC admits that when

employees offer explanations that make sense and are consistent with the evidence, they are usually

believed.  Regardless of ethnicity or national origin, employees who deny the obvious, make claims

that don't make sense, and attack their accusers are usually not believed.  Except as answered above,

MPC denies the allegations of this paragraph.

56.   As a result of Plaintiff complaining, Defendant and its managers began a campaign to assassinate his good name and character when they, among other things, published that he did not know how to program SQL.

ANSWER:  Denied.

57.   Plaintiff has been subjected to different MWPC work standards and policies than other employees solely because Plaintiff complained about MWPC's discrimination against him due to his being of Jordanian and Syrian descent.

ANSWER:  Denied.

58.   The general culture of the Defendant was such that management did not assist him when he complained orally about the ill treatment he was receiving because of his being Middle Eastern, allowed the MWPC manager's discriminatory abuse to be carried out without recourse, and was generally one of a hostile nature toward himself as a Middle Easter [*sic*] IT professional.

ANSWER:  Denied.

59.   Because of the Defendant's retaliatory acts, Plaintiff has been terminated and his reputation has been smeared. He lost wages, he was denied the opportunity to work in a position without the threat of further ill treatment, and he has been humiliated in the presence of other employees of the Defendant that support his work for MWPC, e.g. the accounting staff.

ANSWER:  MPC admits that having been lawfully and appropriately terminated as an employee of

MPC, Haddad no longer has the benefits of such employment.  MPC denies the remaining allegations

of this paragraph.

60.   Defendants have violated Title VII, and will continue to violate Title VII if not enjoined, because MWPC maintains policies, programs, and classifications that impermissibly discriminate on the basis of national origin. Accordingly, defendants have taken personnel actions in violation of the purposes of Title VII that such policies be free from any discrimination based on national origin.

ANSWER:  Denied.

## COUNT III – DEFAMATION

61.    Plaintiff here re-alleges all preceding pleading paragraphs.

ANSWER:  MPC repeats its responses to all preceding paragraphs.

62.    Defendant and its managers published amongst themselves and to other employees written communications with the lie that Plaintiff, an IT specialist, did not know how to write using SQL computer programming language; that his IT work was not good enough to ask for help; and that he used the "f word" while talking with a female worker. (**Ex. 2**).

ANSWER:  Nothing illustrates the sheer outrageousness of this lawsuit better than this allegation.

Exhibit 2 is a photograph of Haddad's computer screen, taken by Haddad after, in violation of

company policy and state and federal law, he hacked into the email account of MPC's General

Manager to read private communications about himself between his immediate supervisor and the

General Manager.  These communications were by definition not public.  They truthfully reported

that Haddad lacked basic skills necessary for performing his job, that he behaved inappropriately

with fellow employees, and that fellow employees were complaining about his rude and belligerent

behavior and expressing reluctance to continue working with him.  Haddad had no right to access

these communications, and he has no right to attach them to his Complaint.  Further, there is nothing

inappropriate about these private communications within a company.  Except as answered above,

MPC denies the allegations of this paragraph.

63.    As a result of the publication of lies about the plaintiff's occupation and Defendant's reckless disregard for looking into the truth, Plaintiff has suffered and the esteem of his colleagues and others to him have been severely diminished.

ANSWER:  Denied
.

WHEREFORE, MPC prays the Court for judgment in its favor and against Haddad on all

 Counts of the Complaint, and for its costs.

COUNTERCLAIM

MPC counterclaims against Haddad as follows.

*Allegations Common to All Counts*

*Parties*

1.      MPC is a Minnesota corporation with its principal place of business in Schererville, Indiana, and it has been operating continuously in Schererville since 1965.

2.      MPC is in the business of applying protective, proprietary coatings to pipe and rebar, and serves steel manufacturers, utilities, the construction industry and others.  MPC has a diverse workforce of over 100 at its Schererville location.

3.      MPC's business involves confidential and proprietary technologies and processes, and MPC makes numerous efforts to safeguard the confidentiality of its technology as well as of the identity, requirements, and purchasing history of its customers.  MPC information technology ("IT") department is a crucial part of MPC's information security system.

3.      Haddad is a white, Christian, native-born American and a resident of Chicago, Illinois.

*Jurisdiction*

4.      This Court has subject matter jurisdiction pursuant to the Defense of Trade Secrets Act, 18 U.S.C. § 1836(c); the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(A)(2)(C) and 1030(a)(4); (3); Fed.R.Civ.P. 13, and the doctrines of pendent, ancillary and supplemental jurisdiction.

*Background*

5.      Haddad was hired by MPC on February 4, 2019 with the title of IT Generalist. Haddad applied for a position with MPC through the indeed.com website, was interviewed

21

personally, and was selected as the best candidate of several to fill a position previously occupied by a contract employee.

6.      There was no discussion of Haddad's ethnicity or national origin during the application process.  Once Haddad was hired, he was asked to fill out a Post-Hire Questionnaire which included demographic data for EEO compliance purposes.  Haddad did not protest this request, and was not told how to fill the form out or how to identify himself.  Haddad checked the box for "White" under "Race," and did not identify himself as being a member of any disadvantaged or minority group, either in response to the survey or in the course of the application process.

7.      Initially, Haddad appeared to be a reasonably good employee, but as time went on he began to display increasingly erratic, disruptive, and threatening behavior.  He frequently behaved in an arrogant and insubordinate manner, did not readily take direction or accept correction, and repeatedly responded to complaints about his behavior by verbally attacking the person complaining and accusing them of misconduct.

8.      Particularly alarming was Haddad's apparent obsessive fear of being observed while ostensibly working, which raised concerns as to whether he was actually doing his job, and suspicions that he might be doing something besides legitimate work for MPC.

9.      Soon after starting work, Haddad requested a screen shield for his computer, allegedly to alleviate glare, even though his cubicle was not near a window or bright lights.  After that, Haddad frequently complained when people entered, passed, or approached his cubicle, assuming that they were trying to see what he was doing, and he would angle his screen away or shoo them away.

10.     Haddad also used the company's security cameras and video monitoring software to keep continuous watch over his work station, displaying the video feed on his screen, and recording and saving it to his computer so he could tell if anyone had been in or near his cubicle while his back

was turned or if he was away.  It was not part of Haddad's duties to monitor the security software or video feed, and it was against company policy for him to make use of them in this way.

11.     Haddad had a particularly bad relationship with his immediate supervisor, Aaron Juarez, C.P.A. a Mexican-American.  Juarez has been employed by MPC since 2016 as Accounting Manager, has a good record as an employee and as a manager, and had not had significant interpersonal conflicts at MPC before Haddad was hired.

12.     Within a couple weeks of Haddad's start date (mid-February), Juarez began to question Haddad's productivity and wonder what he was actually doing with his days.  Juarez therefore asked Haddad to provide him with a weekly itemized list of the tasks he had accomplished, and began meeting with him every Thursday to go over the list.  Juarez approached Haddad in an unthreatening and nonconfrontational manner, and just told him he wanted to see how he was doing and be sure he was productive and his skills were being used appropriately.

13.     Haddad was immediately resentful of these reporting requirements meetings, and almost immediately began to accuse Juarez of "harassment" and to criticize and verbally attack him instead of complying.  As time went on, Haddad's hostility to Juarez increased and began to display a racist edge.  Haddad made it clear from the beginning that as an IT expert he felt it was beneath him to report to an accountant.  Haddad frequently disparaged Juarez behind his back or to his face, and responded to his questions in a patronizing and/or irritated tone.

14.     Juarez was not the only manager who was concerned about Haddad.  Other managers, for instance HR Director Jeff Clapman, noted that when asked what he was doing, Haddad seemed evasive, and provided an ostensible explanation but used jargon which Clapman found incomprehensible and began to suspect was nonsense.  No similar problems had been experienced with Haddad's predecessors, who were able to explain clearly what they were doing in terms

23

intelligible to a lay person.

15.     Very soon after Haddad started, he seemed unwilling or unable to perform an important task.  At this time MPC was beginning to transition away from a software product called Made2Manage, which interfaces with Excel spreadsheets.  Because the plan was to eventually export the data in Excel format when the company switched to a new data management product, it was important for the spreadsheets to be error-free.  Accounting staff were experiencing persistent functional problems with the spreadsheet form they were using.

16.     Therefore, on or about March 12, 2019, Accounting Department employee Nancy Morgan, backed by Juarez, asked Haddad to troubleshoot the spreadsheet form and try to fix the problems she was encountering.  Haddad professed to be unable to find anything wrong with the spreadsheet form, or to understand what was required of him.

17.     Haddad blamed "the accountants" for "not knowing how to use a spreadsheet," and went over Juarez' head to the parent company's IT Manager, Bruce Zamaere.  In communicating with Zamaere, Haddad misrepresented the issue as being asked to do accounting work, and manipulated Zamaere into telling Juarez to stop asking Haddad to work on the spreadsheet form. Haddad claimed to Zamaere and to others that in asking him to perform this task, Juarez was "putting his workload" on Haddad.  Haddad also accused Juarez of "working him to death," and treating him like a "slave," while claiming falsely that Juarez himself was lazy and unproductive.

18.     Once it was explained to Zamaere that Haddad was being asked to perform an IT task, he reversed himself and told Haddad to fix the spreadsheet form.  Nonetheless, Haddad never did what was asked of him, or furnished a coherent explanation for why he could not.  Eventually Juarez gave up trying to get Haddad to fix the spreadsheet form.

19.     On or about March 21, after one of their weekly update meetings, Juarez and Haddad

had a personal conversation in which, for the first and only time, Haddad's ethnicity was referred to by someone besides Haddad.  This conversation was initiated by Haddad.  Noting that Juarez is Mexican-American, Haddad told Juarez that he used to be "the boss of several Mexican line cooks" at his cousin's restaurant, that they used to "come crying" to him that his cousin was not paying them, and that he would intercede for them and get them paid.  Allegedly (as he later said) "to demonstrate what respect or cultural awareness really is," Haddad recited all their names in what he considered a correct "Mexican accent," told Juarez which Mexican states they were from, and said his cousin had "even" once employed an Ecuadorean.

20.     In this conversation, Haddad asked what Juarez did that previous weekend and Juarez said he went to a friend's house, and mentioned in passing that his friend was of Arab origin.  Juarez added that his friend's wife makes amazing food, and that he loves Arab food and music.  Juarez said they often have get-togethers with friends.  Juarez never complained about Haddad's patronizing and arguably racist remarks about Mexicans and Hispanics.  At the time, Haddad did not complain about Juarez' remarks.  This was ostensibly a casual, friendly conversation, and Juarez was trying to connect with Haddad and smooth over their already difficult relationship.  Juarez did not initiate the conversation about ethnicity;  Haddad did.

21.     On or about April 1, 2019, in connection with the spreadsheet form project, Haddad sent an email to Juarez and others regarding his duties in which he referred to accounting as "bitch work" and attached a "job description" which had him reporting to the General Manager and the IT Director, but not to Juarez, the Accounting Manager.  This was part of a course of conduct by Haddad of refusing to acknowledge Juarez' authority over him and trying to undermine Juarez' position in the company.

22.     When Juarez complained about Haddad's insubordinate and insulting email, Haddad

claimed he was "in bereavement due to the death of a family member," and that "bitch work" was the voice recognition software's misinterpretation of the phrase "extra bits of work."  Nobody believed this, and it was noticeably part of a pattern by Haddad of offering lame and insultingly implausible excuses when confronted about unacceptable behavior.

23.     Haddad then (a day or two after April 1) requested that Juarez be brought into a meeting with the HR Manager (Clapman), where Haddad was being reproved for his disrespectful language and attitude toward the Accounting Department, so he could "apologize" to Juarez. Haddad's "apology," later recapped in an email, included disparaging Juarez' competence, claiming that he, Haddad, was one of the most productive employees in the company, and suggesting "HR training" for Juarez and another employee who had complained about Haddad's behavior, Chuck Sajda.

24.     While he was offering his non-apology for insulting Juarez, as later recapped in his email, Haddad complained to Clapman that Sajda was "harassing" him by "peering into my workspace over my shoulder" and looking at his computer screen.  Haddad also complained that Sajda chews tobacco, and that "nicotine is a drug," and that therefore, Sajda was 'doing drugs on the job.'  Chewing tobacco is not a violation of company policy, and of course does not constitute illegal drug use.  This was explained to Haddad, and he was admonished to behave professionally and to mind his own business.

25.     After this admonition, Haddad seemed to calm down for a while, although his friction with Juarez continued, and other employees complained about his periodically rude and inconsiderate behavior, as well as his ongoing obsession with not letting anyone see what was on his screen.

26.     During the week of September 9, 2019, multiple employees reported to Juarez that

26

Haddad was sleeping at his work station.  Kathy Walsh complained of this on the 9th.  The morning of the 12th Bernadette Cwik told Juarez Haddad was again sleeping on the job.  The afternoon of the same day, Chuck Sajda came to Juarez and reported that Haddad was again (or still) sleeping at his desk.

27.     At first, Juarez shrugged off the complaints, reluctant to engage in another unpleasant exchange with Haddad.  After the fourth or fifth time someone told him that Haddad was sleeping, Juarez went to check on him, and found Haddad fast asleep at his desk, and snoring noticeably.  Still reluctant to start a confrontation, Juarez did not wake Haddad, but used his cellphone to take a still photo of him sleeping and went back to his office.  Juarez took the photo because of Haddad's by now well-established pattern of denying any wrongdoing and attacking his accusers.

28.     When he woke up, Haddad checked the recorded security video feed which he kept open on his computer desktop.  In the security video, Haddad, saw Juarez taking his photo while he was asleep.  Haddad immediately ran to Juarez' office in an obvious panic, sputtering that he was going to sue the company and file discrimination charges.

29.     At no time did Haddad offer any explanation for sleeping at his desk.   He never claimed to have any medical condition, or to be on any medication, which would make it difficult to stay awake, nor did he even say he was tired or had trouble sleeping.  Nor, at this time, did he claim to have been "on break."

30.     Instead, Haddad vehemently denied the obvious fact that he was sleeping on the job. He claimed that the still photo was misleading, and that the recorded security video feed showed him "clearly twiddling his thumbs" at the time the photo was taken.  Haddad then ran to the HR manager (Clapman) to complain about being photographed, and later sent Clapman an email and text messages suggesting that Juarez took the photo "to satisfy a sexual desire of his," proclaiming his

lack of homophobia while also proclaiming "this is gay," and demanded that Clapman order Juarez to delete all photos of him.  Clapman explained to Haddad that the issue was Haddad sleeping on the job, not Juarez taking a photo.

31.    After he was caught by Juarez sleeping instead of working, Haddad retaliated by complaining to HR about Juarez.  For the first time, Haddad claimed that in their March 21 conversation, Juarez had pronounced the word Arab as "Ay-rab," and claimed that this was  "racial slur."  For the first time, Haddad claimed that Juarez had a racial or ethnic animus against him.

32.    Clapman took Haddad's accusations at face value and investigated.  Clapman questioned Juarez, who denied that he had intentionally said anything offensive or inappropriate in this by-now-six-months-old conversation, or that Haddad had seemed to take offense at anything he had said.  Nonetheless Juarez was given a formal written reprimand and an admonishment to be careful about discussing ethnicity with employees.

33.    A day or two later, Haddad showed up for work in a garb that appeared to be an attempt to suggest 'traditional Arab dress,' a garment described as a "robe" and headgear which was not a hat.  Haddad had never dressed like this before at the office, usually wearing khaki pants and a polo shirt or button down shirt and sportcoat.  Nobody commented on this one-day change of clothing style, including Haddad.

34.    The next day, September 13, 2019, although he was expected, Haddad did not show up for work.  That morning, there was a sudden and unexplained partial email outage at MPC.  Nancy Morgan emailed Haddad from her personal email account to ask him to do something about it.  Haddad refused, responding "don't call me on my off days" (he was not supposed to be off) and sent another email to Morgan, copying others, saying "Aaron [Juarez] is a smart guy, ask Aaron to fix it."

35    Clapman contacted Haddad to find out why he was not at work and why he would not

fix the email outage.  Haddad explained his absence from the office by claiming he had "assumed" he was terminated after the sleeping incidents, although no one had told him that.  Clapman told Haddad to come to work, as he had not been fired and was still on the payroll, and to restore full email service.  It was strongly suspected that Haddad had caused the email outage himself, but he was not accused of that, just asked to make it stop.  After he restored email service, Clapman instructed Haddad to leave, but said he would remain on the payroll pending further review of the situation and would be expected to work.  Haddad continued to come to work.

36.     Haddad's supposed refutation of the charge that he was sleeping not only failed to disprove it, but showed that he was abusing his position and gaining unauthorized access to the security system.  On September 18, 2019 Haddad was explicitly advised by Clapman that he should not access the company's video surveillance system unless he had specific and explicit approval from a supervisor, and then only for legitimate company business.  Haddad's response was that people should not be looking at his screen and seeing what he had open on his desktop.

37.     In his September 18 email to Clapman, Haddad went on:  "The reason why the complaint of viewing my screen was due to the sensitive circumstances of the work.  Trust me Jeff, In Example I rather make 140,000$ a year as an IT Architect (AVG pay for role) one day than steal social security information if you understand what I mean?  As IT I do have access to sensitive information.  You need to make peace with this as well."

38.     Haddad's blatant allusion to the possibility that he could, or might, use his access to the network to commit identity theft was alarming to Clapman.  Especially given Haddad's behavior, this was seen as either a threat that he might abuse his position, or an admission that he had already done so.

39.     On September 19, 2019 at 2:39 a.m., Haddad emailed Juarez, copying Clapman,

Chermak, and an officer at the parent company, accusing Juarez of "defamation" for saying he should not load unauthorized software onto MPC's network. The software in question was unsecure freeware called Spybot which Haddad said he was using to combat spam email. Juarez had informed Chermak of this breach of security policy by Haddad. This after-midnight message from Haddad was clearly a hint that Haddad had been hacking into MPC's email system, by remote access in the middle of the night.

40. Later on September 19, during the work day, for no apparent reason, Haddad approached Christy Crowley, another employee, and asked how many children she had. On being told she had one, he said "oh, I figured you'd be on your fourth child by now," and claimed he had thought she was Jeff Clapman's daughter, because "companies like this like to hire family." Crowley felt threatened and complained to HR.

41. Later the same afternoon (on September 19), Bernadette Cwik, another employee complained to Juarez that Haddad had walked past her work station inappropriately close, and then approached and sworn at her in an intimidating manner. Cwik was one of the employees who had reported to Juarez that Haddad was sleeping at his desk the previous week. Juarez notified Clapman that Cwik felt threatened and did not feel comfortable talking to Haddad. Exhibit 2 to the Complaint is the email from Cwik to Juarez, forwarded to Chermak, which Haddad illegally accessed by hacking into other employees' email accounts.

42. On the afternoon of September 19, 2019, Haddad confirmed that he was obtaining unauthorized access to sensitive data by emailing Clapman a photo of his computer screen showing that he had accessed the email account of the General Manager, Joel Chermak, and was monitoring complaints about himself to Chermak from Juarez, as well as complaints from other employees about himself relayed to Chermak by Juarez. This photo is part of Exhibit 2 to the Complaint.

43.     Beginning at 12:36 a.m. on September 20, 2019, Haddad sent Clapman two emails, which Haddad later (2:46 a.m.) forwarded to Joel Chermak, claiming that video from the security camera feed (which he was not supposed to have accessed) "proved" it was not true that he had tried to intimidate Cwik, and that Cwik was "the only person [Juarez] could "coerce" to say something like that.

44.     Haddad went on to call Juarez "a moron," "pure evil," and "the craziest person I have ever met," concluding "Listen Jeff, take care of this guy, this is unacceptable.  SHALOM."

45.     At about the same time, Haddad also (in an email copied to her) accused Cwik of 'almost hopping in his lap' and coming to him to talk "for an hour."  Cwik denied this, and the capture from surveillance video Haddad offered as proof only shows her standing some distance away, probably going to the coffee machine outside his cubicle.

46.     In the same email exchange, Haddad demanded that Clapman "deal with" Juarez, and said "I do not feel safe with Aaron prowling about."

47.     At about the same time, Haddad disclosed that he had obtained unauthorized access to Clapman's privileged and confidential attorney-client communications with MPC's counsel, by hacking into his email, by asking ostentatiously when Clapman had first sought legal advice, using the name of the attorney, whom he had never met, and sending threatening emails directly to the attorney at the address he obtained by that unauthorized access.

48.     That day, September 20, 2019, the decision was made to terminate Haddad.  The reasons were multifarious and obvious.  Juarez had asked that Haddad be terminated when he was caught sleeping and reacted in such a belligerent and unapologetic way.  Especially after Haddad's increasingly erratic and threatening behavior, Clapman and Chermak agreed that Haddad was a potential problem for the company and a source of disruption to other employees, and that he had to

go, regardless of his claims of "harassment" and "discrimination," which they had found to be unfounded and a manipulative attempt to ward off firing or set up a lawsuit.

49.     Clapman was concerned that Haddad would use his access to the MPC computer network to conduct sabotage, and that he might even become physically violent.  Clapman therefore asked Haddad to come to HR, told him he was terminated, walked with him back to his cubicle to get his personal effects, and then walked him out of the building.  Haddad responded by becoming very loud and abusive, and it proved impossible to conduct an exit interview or have a coherent conversation with him.   However, he left without further incident and drove away.

50.     Clapman had called the Schererville police, but did not request that they take any action.  The officers merely sat in their car in the MPC parking lot to see if they were needed.  Haddad saw them, and asked Clapman "are they for me?," was told it was just a precaution, and drove over to the officers and said something to them on his way out.

51.     Shortly after being fired, Haddad provided Clapman by email with a written narrative of his version of events, purportedly supported by video clips misappropriated from MPC's security video feed and uploaded to Haddad's google account.

52.     Unfortunately, this was not the last that MPC heard from Haddad.  After Haddad was escorted from the premises, it was found that the keys to the server room were missing.  On October 3, Clapman emailed Haddad politely asking him to return the keys, and Haddad responded by denying he had ever had the keys (which was known to be untrue), and demanding "do not contact me for these keys…. If you see me on the street do not even look [at] me."

53.     Notwithstanding his professed desire not to be contacted by MPC, Haddad persisted in contacting MPC employees.  On November 4, 2019, Haddad texted Juarez to say "I think your parents were too busy cutting grass rather than raising you. Maybe they were downing tequila shots

32

and having sex with goats. You almost signed off on your own ass whopping. If I wasn't who I was and had more to lose I would have fucking crack your head open you fucking piece of shit." Mr. Haddad then follow up with another message "I had some friends offer to whoop your ass dude literally in their own words "he doesn't know what I look like he can't pick me out in a line up I'll bop him one time real good in the nose" but I don't agree with violence. You are a piece of shit that's good enough for me, I handled you the right way."  Then Haddad claimed not to believe in violence. Then he texted Juarez Juarez' home address to show that he knew where he lived.  Juarez responded by asking Haddad to get help, and told him to leave him alone.

54.     On November 9, 2019, Haddad texted Clapman, calling him a "dumb motherfucker" and a "piece of shit," calling his termination of Haddad "a Zionist decision," going on to boast he wore a $10,000 wristwatch but that Juarez and Clapman were too 'dumb' to recognize it, and claiming he used to make much more money than Clapman "working one-hour days."

55.     In mid-December, 2019, Haddad set up a Gmail address designed to look like a genuine MPC email address, midwestpipebarcoating@gmail.com.  From this 'spoof' address, Haddad sent a broadcast email to an unknown number of MPC's clients.  It is obvious that Haddad could not have done this without obtaining a copy of MPC's customer list, illegally and in violation of company policy and the Employee Handbook.

56.     MPC was flooded with inquiries from its customers, many of whom expressed concern about the 'spoof' email.  MPC's relationship with its clients and business reputation were, inevitably, damaged, despite attempts to mitigate.  The 'spoof' emails which MPC was able to obtain copies of read as follows, under the title "Midwest Pipe Coating; Racial Slurs":

> Is your team aware that you are doing business with a company that had managerial staff that use racial slurs? the individual was written up but he is still on payroll and imagine being a minority working under that individual. In this political climate this

effects not only on the individual, but the company its self and on the companies
that do business with this company. In other words you are permitting this behavior,
and are tolerating it. HR is ineffective. It is like the wild west down yonder over
here in Schererville due to ineffective HR. Please I urge you to buy your pipe from a
competitor instead of Midwest Pipe Coating until this situation is remedied.

57.    When a number of customers responded to the email by defending MPC or asking

who was really sending this message, Haddad engaged in an escalating series of harassing and

insulting emails with them.

58.    Haddad at first denied he was behind these 'spoof' emails, but then admitted that he

was.  On December 18, 2019, MPC's counsel emailed Haddad a 'cease and desist' letter requiring

that he stop attempts to damage MPC's business with these emails and return any confidential data

he had taken.

59.    Within less than five minutes of the email's transmission to Haddad's personal email

address, the telephone rang.  The caller ID said "Ziad Haddad,"  Ziad Haddad is the name of Robert

Haddad's father; Ziad is also Haddad's middle name.  The caller (a male voice) snarled "If you were

found with a rope around your neck, it would be called an accident." Then he said "you fucking piece

of shit, don't ever call me again" and hung up.

60.    In subsequent telephone and email exchanges, Haddad admitted this caller was him,

although he claimed it was not a threat:  "It was not a threat don't misconstrue it is [*sic*] such I'm

simply saying that if you hang yourself that it would not be investigated as a homicide it would be

investigated as a suicide that is a fact that's not a threat now you leave me alone."

61.    On January 6, 2020, Haddad filed a Charge of Discrimination against MPC with the

Indianapolis office of the Equal Employment Opportunity Commission.  On February 27, MPC filed

its Response.

62.    On April 24, 2020, Haddad called Clapman and began to harangue him about his

34

Charge, claim the Response contained lies and defamation, and claim that he had been issued a right to sue letter and would soon be suing.  Clapman responded that they should not be talking and then hung up.  Haddad then sent Clapman multiple text messages accusing Clapman of "misquoting" him in the past.

63.     On April 27 at 9:44 AM, Haddad sent an email to the EEOC Investigator, copied to Clapman, containing a link to approximately 8 hours' worth of MPC's surveillance video which he had apparently captured and downloaded from MPC's network in defiance of the law, company policy, and specific instructions from his supervisors.

64.     Haddad's email claimed this video proved Bernadette Cwik was "hovering over" him, and he did not approach or harass her, an allegation he had made before.  The email states in part: "I have CC'd Jeff Clapman in… hopes that he will correct his demeanor…."

65.     Haddad's email attached a timeline and various diatribes apparently sent to the EEOC Investigator, including the following:

> Jeff Clapman is a half-Jew. I believe Jeff has personal motivations just like Zionists do the same thing to the Palestinian people only I do not care for the Palestinian agenda. Might I add I have a friend in the Israeli Defense Force (IDF) Israeli Military that constantly apologizes to me for the atrocities committed to the Arab people by the Jewish people. I tell them when you open up a bible and skip to the back where the ancient maps are that Israel is right where it belongs and my agenda as a Jordanian American has nothing to do with the Palestinian plight. I have no political or personal agendas in regards to this but I belief Jeff does. Why else am I racially profiled by a half - Jew ? I believe Jeff Clapman is also friends with Michael Pucci who went to Highschool 40 years prior with my father and his cousins.

66.     On April 28, 2020, Haddad sent an email to Kelly Fitzgerald, Assistant Principal and Athletic Director Andrean Highschool, where Clapman has a part-time position coaching girls' soccer.  The email says in part of Clapman:  "I believe he does not have the integrity to coach tomorrows young minds" and "Jeff has been practicing deceitful tactics during the duration of my

ongoing Federal EEOC investigation and I would like to inform you that this man should not be coaching your children as he is attempting to defraud an ongoing federal investigation by disregarding undeniable facts, omissions, and the inclusion of irrelevant information not related to employment."

67.    Haddad's email to Andrean High School had nothing to do with his EEOC Charge, and was a transparently malicious act aimed at Clapman and MPC, intended to defame Clapman and to send him the message 'I know where to find you.'  Haddad would not have gotten into MPC's facility, but he might have been able to access open playing fields around the high school.

68.    In approximately mid-April MPC employee Nancy Morgan was buying gasoline in Griffith, Indiana at the corner of Broad Street and Route 45, a 7/11 Mobile station and she found Haddad there, ostensibly buying gas.  He acknowledged and waved at her.  Haddad lives in Chicago and had no reason to be in Griffith, Indiana.  In casual conversation while he worked at Midwest Pipe Coating, Morgan had told him she lived in Griffith.

69.    On May 7, 2020, at 5:02 pm, leaving work at MPC, Morgan saw Haddad drive past her, right in front of the facility in his older model black Cadillac.  He has tinted windows up had the window rolled down, even though the temperature was in the 40s, so she could see him.  He had clearly been waiting outside the facility for her, or someone else, to come out.

70.    On May 14, 2020, at about 5:30, Haddad twice drove by Juarez' house in St. John, Indiana, in what appeared to be the same vehicle, a black or navy blue Cadillac.  Not only did Haddad have no reason to be in St. John Indiana but Juarez' house is on a cul de sac and he had no reason to be driving through, but he drove by at least twice.  Juarez observed that Haddad had other people in the car with him.

71.    Upon being contacted by the Schererville Police, Haddad, for the time being at least,

ceased these attempts at harassment and intimidation of MPC and its employees.

COUNT I
<u>DEFENSE OF TRADE SECRETS ACT</u>

1-71.    MPC repeats and realleges pars. 1-71 above as pars. 1-71 hereof.

72.    The Defend Trade Secrets Act, 18 U.S.C. § 1836, prohibits the misappropriation and use of trade secrets, and provides civil remedies therefor.

72.    Haddad clearly and undisputedly obtained prohibited access to MPC's data.  In so doing, it is obvious that he downloaded a customer list or data containing a customer list, which allowed him to send out his defamatory emails attempting to damage MPC's relationships with its customers.

73.    MPC took reasonable steps to keep its information confidential by, among other things; maintaining the information in a secure server that could only be accessed by an assigned username and password; by adopting policies and procedures to maintain the confidentiality of the information; by taking steps to determine whether breaches of these policies occurred and responding to actual or potential breaches.

74.    This confidential, proprietary, and trade secret information, including but not limited to the customer list, derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

75.    Haddad misappropriated MPC's Confidential Records, including but not necessarily limited to its customer list and contact information, by accessing it and taking it without permission and for reasons of malice and personal vindictiveness.

76.    Haddad used MPC's Confidential Records without either express or implied consent.

77.    Haddad's conduct violates the Defense of Trade Secrets Act, and MPC has a right to

37

money damages as well as injunctive relief.

WHEREFORE, MPC prays the Court for such relief as it deems just and appropriate for misappropriation of its Confidential Records under the Defense of Trade Secrets Act, including an order that Haddad return all misappropriated data, actual damages, and injunctive relief, and attorneys' fees.

<div align="center">

COUNT II
COMPUTER FRAUD AND ABUSE ACT
</div>

1-71.   MPC repeats and realleges pars. 1-71 above as pars. 1-71 hereof.

72.   The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(A)(2)(C) and 1030(a)(4), outlaws accessing a computer or computer system without authorization or in excess of authorization.

73.   MPC's computers and network are connected to the Internet, and are used in and affecting interstate and foreign commerce, and therefore subject to the CFAA.

73.   As an IT Generalist working for MPC, Haddad had access to such portions of MPC's computer network as he needed to discharge his duties, for purposes of discharging those duties only.

74.   Haddad exceeded his authority and improperly access MPC's confidential data by (without limitation) the following acts:

A.   Accessing the email server and signing into MPC's email network as an imposter, using the credentials of Jeff Clapman, Joel Chermak, and Aaron Juarez, possibly among others, for the purpose of reading confidential communications among them, and with others, including counsel, about him and their intentions with regard to disciplining him for misconduct on the job.

B.   Accessing MPC's security video feed and security software, and downloading large amounts of video to his google account.

C.   Accessing MPC's customer list and contact data and importing it to his google account to use in sending his defamatory message to MPC's customers.

D.   On information and belief, causing the MPC email system to 'crash' and become partially or completely nonfunctional on the date he was caught sleeping on the job, and possibly on other occasions.

<div align="center">38</div>

75.     MPC has been damaged by Haddad's unauthorized access and misuse of its data in an amount likely exceeding $5,000 in a calendar year, including but not limited to disruption of customer relationships and lost business.

WHEREFORE, MPC prays the Court for such relief as it deems just and appropriate for Haddad's violations of the Computer Fraud and Abuse Act.

## COUNT III
## DEFAMATION

1-71.   MPC repeats and realleges pars. 1-71 above as pars. 1-71 hereof.

72.     In sending the above-referenced email communication to many if not all of MPC's customers, Haddad made defamatory remarks, including the false claim that "management used racial slurs," and that the company was "like the wild west" due to "ineffective HR."

73.     Haddad made these defamatory comments knowingly and maliciously, in retaliation for being fired by MPC for more than adequate cause.

74.     The broadcast email constituted "publication" for purposes of defamation under Indiana law.

75.     MPC suffered damages as a result of the defamation, including but not limited to costs of communication with its customers to remediate and restore relationships, and lost business.

76.     Haddad is therefore liable to MPC for defamation under common law.

WHEREFORE, MPC prays the Court for judgment against Haddad for its actual damages, plus punitive damages, and costs.

## COUNT IV
## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS

1-71.   MPC repeats and realleges pars. 1-71 above as pars. 1-71 hereof.

72.     Haddad's above-described behavior in sending a broadcast email to MPC's customers making defamatory statements about MPC constitutes intentional interference with business relationships under Indiana law.

74.     Haddad was aware of MPC's business relationships with its customers.

75.     Haddad acted maliciously and without justification in sending his email.

76.     Haddad's email explicitly asks MPC's customers to cease doing business with MPC.

77.     MPC has lost sales as a result of Haddad's intentional and malicious interference with its business relationships.

WHEREFORE, MPC prays the Court for judgment against Haddad in an amount to be proved at trial, plus punitive damages.

## COUNT V
## DECLARATORY JUDGMENT

1-71.   MPC repeats and realleges pars. 1-71 above as pars. 1-71 hereof.

72.     Indiana is an at-will employment state.  In the absence of a valid and enforceable contract to the contrary, an employer has every right to terminate an employee, for any reason or for no reason, just as the employee is free to resign at any time for any reason.

73.     Haddad was very obviously a bad employee.  He seemed to have misrepresented and oversold his capabilities, he was unwilling or unable to perform many job functions, he was arrogant and insubordinate, belligerent and threatening in response to criticism, paranoid and secretive, and frequently unproductive.  His pattern of behavior gives rise to a strong inference that he spent a good deal of time at work doing things that were inappropriate or not work related.  He has openly admitted accessing and reading other employees' email and misusing the security system.

74.     MPC had every right to fire Haddad.  Haddad's outrageously vindictive, threatening

behavior after being terminated only confirms the justice of firing him and shows what kind of person he is, not to mention confirming that his claims of discrimination are retaliatory and designed to intimidate MPC into making an undeserved payment or giving him back his job despite his obvious unsuitability.

75.     There is no rational or objective basis to conclude that MPC's decision to fire Haddad was motivated by any illegal or inappropriate motive, including the ethnic or national origin animus he is claiming.

76.     There is an actual controversy between MPC and Haddad regarding the jurisdiction for terminating Haddad and for refusing to reinstate him.

78.     Pursuant to 28 U.S. Code § 2201 *et seq*, MPC is entitled to and hereby requests a declaratory judgment.

WHEREFORE, MPC prays the Court for a declaratory judgment that its termination of Haddad, and refusal to reinstate him, was legally justified and not occasioned by any illegal or dissimilatory motive.

## AFFIRMATIVE DEFENSES

### *I.  Unclean Hands*

1-71.     MPC repeats pars. 1-71 of the Counterclaim as pars. 1-71 hereof.

72.     Haddad's unethical behavior in violating company policy on confidentiality, hacking into to other employees' email, and threatening and stalking MPC employees and witnesses in this case constitutes 'unclean hands' and should bar him from obtaining any equitable relief.

### *II.  Lack of Damages/Failure to Mitigate.*

1.     Throughout his tenure at MPC, and ever since, Haddad has been the President of Innovative Information Solutions, LLC, and has held himself out as an independent IT professional

41

with an active consulting business.  See https://informativeinformationsolutions.com/

     2.     Taking his website and his claims of extensive experience and expertise at face value, Haddad already had a job when he was terminated by MPC.

     3.     Therefore, either Haddad has no damages, or he has failed to mitigate his damages by pursuing opportunities through his company Innovative Information Solutions to replace the income lost with the MPC position.

<div style="margin-left:40%">

Respectfully submitted,
MIDWEST PIPECOATING, INC.

By:

/s/ Marcos Reilly
HINSHAW & CULBERTSON, LLP
151 N. Franklin St., Suite 2500
Chicago, IL 60606
mreilly@hinshawlaw.com
(312) 704-3000
(312) 704-3001 (fax)
Jennifer J. Kalas
HINSHAW & CULBERTSON LLP
322 Indianapolis Blvd, Suite 201,
Schererville, IN 46375
(219) 864-4521
(219) 864-5052 (fax)
jkalas@hinshawlaw.com
*Attorneys for Defendant*

</div>